Filed 11/25/24 (opinion following rehearing)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B328388 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. BA474486 |
| v. | |
| SANTIAGO GONZALO CANALES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James R. Dabney, Judge. Convictions affirmed, sentence vacated, and remanded for resentencing.

George Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and Stefanie Yee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Santiago Gonzalo Canales appeals his convictions for lewd acts and for continuous sexual abuse of children. (Pen. Code, §§ 288, 288.5.) Canales challenges two jury instructions. First is CALCRIM No. 1120, which Canales argues did not identify the correct mental states for Penal Code section 288.5's offense of continuous sexual abuse. We construe this complex statute according to a venerable canon of statutory interpretation: the presumption of mandatory culpability. This canon validates CALCRIM No. 1120. Canales's second challenge concerns CALCRIM No. 252. The prosecution agrees with Canales that this instruction, as given, was error. We hold any error was harmless, and note that avoiding the terms "specific intent" and "general intent" could reduce future instructional issues. Canales forfeited a third challenge, but, on his fourth point, we agree with both parties: Canales must be resentenced. We remand for this purpose. All code citations are to the Penal Code.

## I

Canales sexually abused his stepdaughter and his niece for years. Both were under the age of 14 during the abuse. Canales touched his niece in inappropriate ways, including touching her vagina, but he did not penetrate her vagina. Canales did penetrate his stepdaughter's vagina with his penis and fingers. He also touched her in other inappropriate ways.

## A

The key trial witnesses were Canales's niece, his stepdaughter, and Canales.

## 1

Canales's niece, born December 23, 2001, testified Canales sexually molested her from ages seven through 13. Canales first asked her to go upstairs, saying he had something to give her.

The niece recalled she was seven but could not remember the exact date. This placed the event after her seventh birthday, which was December 23, 2008, and before her eighth birthday a year later. These dates are significant.

Upstairs in a bedroom, "it started with just him caressing my body." Canales kept telling her it was okay.

Two days later he caressed her chest and back and gave her two dollars.

From then on, Canales continued molesting his niece until she was 13. Canales touched the skin of her vagina, thighs, back, and breasts. He moved his hand when he touched her vagina and touched her back with his penis. When he was done, Canales usually gave her money.

Canales touched her breasts almost every time he saw her, which was about twice a week. He rubbed her outer and inner thighs "[a]ll the time." Canales touched her vagina eight to ten times.

"[A]s I grew older, I felt more uncomfortable with what he was doing." She told him to stop, and he told her it was okay.

2

Canales's stepdaughter, born in 1991, testified she was about 11 when Canales began molesting her. Canales began his abuse of his stepdaughter in 2002.

Canales touched his stepdaughter's vagina under her underwear, put his fingers inside her vagina, and moved them around. Canales told her that it was okay, but that she should not tell her mother. Canales began penetrating his stepdaughter's vagina with his penis. When she was 12 or 13, this happened about once a month.

When the stepdaughter turned 14, Canales continued his abuse. The prosecution did not charge Canales with abusing his stepdaughter after she turned 14, but she testified he began orally copulating her at that point. He did this 12 to 15 times. He continued to abuse her sexually until she was almost 16.

He gave her money afterwards and told her to hide it. Sometimes he would leave the money in the bathroom after he washed up. She testified, "I felt like a prostitute."

### 3

Canales testified he never did anything sexual with either girl. He denied taking his niece to a room on the second floor and denied touching her inappropriately. He never molested his stepdaughter, never touched her inappropriately, and never had intercourse with her.

### B

The amended information charged Canales with four counts.

1. A lewd act (§ 288, subd. (a)) on his *niece* during the year following December 23, 2008 (count 1). This was when the niece was seven years old.
2. Continuous sexual abuse of a child (§ 288.5, subd. (a))—his *niece*—between 2009 and 2013 (count 2).
3. A lewd act (§ 288, subd. (a)) on his *niece* during the two years following December 23, 2013 (count 3). This was when the niece was 12 or 13 years of age.
4. Continuous sexual abuse (§ 288.5, subd. (a)) of his *stepdaughter* between 2002 and 2005 (count 4). The stepdaughter was 11 to 13 years old from 2002 to 2005.

Counts two and four charged violations of the statute prohibiting continuous sexual abuse of a child. That statute is the focus of Canales's appeal.

C

The trial lasted eight days.

During closing argument, the prosecution urged jurors to believe the niece, the stepdaughter, and the other prosecution witnesses.

Canales's closing argument was "it didn't happen." His attorney contended the prosecution witnesses were inconsistent and unreliable and had incentives to lie. "[W]ithin this family, there's a lot of bad blood." The defense argued the prosecution's version of events did not make sense, which created reasonable doubt.

Jurors began deliberating at 2:47 p.m. on the last day of trial. About an hour later, they convicted Canales on all counts and found true the multiple victims allegations. The duration of this deliberation was short, implying jurors did not think the case was hard to decide. Because of the multiple-victim allegation, the court sentenced Canales to 60 years to life in prison, consisting of four consecutive sentences of 15 years to life.

II

Canales makes four arguments. Two lack merit, the third is forfeited, and the fourth is correct.

Canales's first two arguments are about, respectively, CALCRIM No. 1120 and CALCRIM No. 252.

Canales's first argument is about CALCRIM No. 1120. He maintains this jury instruction should have included a heightened mental state requirement for the element of "substantial sexual conduct," which is a part of section 288.5's

5

offense of continuous sexual abuse of a child. The presumption of mandatory culpability shows Canales's proposal misinterprets section 288.5. This claim fails.

Canales's second argument is that CALCRIM No. 252 misapplied the terms "general intent" and "specific intent." We hold any error was harmless, and we note Canales's suggestion that the use of these terms was unnecessary and can be mischievous.

Canales forfeited his third argument.

Canales's fourth argument is about his sentencing. The prosecution agrees with Canales on this point, and so do we. We remand for resentencing.

A

When construing statutes and reviewing challenges to jury instructions, our review is independent. (E.g., *People v. Thomas* (2023) 14 Cal.5th 327, 382.)

1

A decision from 1866 instructs us that "to constitute what the law deems a crime there must concur both an evil act and an evil intent. *Actus non facit reum nisi mens sit rea.*" (*People v. Harris* (1866) 29 Cal. 678, 681 (*Harris*).) The italicized phrase means an act does not make one guilty unless one's mind is guilty. (LaFave, Modern Criminal Law: Cases, Comments and Questions (4th ed. 2006) p. 111.) An alternative translation is "[a]n act does not constitute a crime unless there is criminal intent." (Scalia & Garner, Reading Law: The Interpretation of Legal Texts (2012) p. 303 (Reading Law).)

In 1872, California enacted section 20, which provides that for every crime there must exist a union, or joint operation, of act and intent, or criminal negligence.

6

The 1866 *Harris* decision and the 1872 statute express the "ancient requirement of a culpable state of mind." (*Morissette v. United States* (1952) 342 U.S. 246, 250 (*Morissette*).)

The culpability requirement is general in Anglo-American criminal law.

"The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. . . . Unqualified acceptance of this doctrine by English common law in the Eighteenth Century was indicated by Blackstone's sweeping statement that to constitute any crime there must first be a 'vicious will.' . . . Crime, as a compound concept, generally constituted only from concurrence of *an evil-meaning mind* with an evil-doing hand, was congenial to an intense individualism and took deep and early root in American soil." (*Morissette*, *supra*, 342 U.S. at pp. 250–252, italics added.)

Mens rea, or *an evil-meaning mind*, is profoundly significant, as this case illustrates. Consider the act of touching a child. Parents, teachers, and others touch youngsters every day in socially accepted and socially desirable ways. But to touch a child with the intent of creating sexual arousal is a serious crime. (*People v. Martinez* (1995) 11 Cal.4th 434, 442 ["any touching" of an underage child committed with the intent to sexually arouse either the defendant or the child is a felony].)

The mental state with which an act is done can make a world of difference.

The pervasiveness of the requirement of an "evil-meaning" mind means that, even when criminal statutes are written to

7

include *no* mens rea requirement, "courts *assumed that the omission did not signify disapproval of the principle but merely recognized that intent was so inherent in the idea of the offense that it required no statutory affirmation.*" (*Morissette, supra*, 342 U.S. at p. 252, italics added.)

Courts in the last half-century have interpreted criminal statutes by presuming legislators intended their statutes to outlaw only morally culpable conduct. The presumption is legislators do not want to incriminate "morally innocent" conduct. (*People v. Vogel* (1956) 46 Cal.2d 798, 804 (*Vogel*).)

This canon of statutory interpretation is the presumption of mandatory culpability. (Cf. Reading Law, *supra*, at p. 303 [describing the "Mens Rea Canon"].)

California courts have been applying the presumption of mandatory culpability for generations.

Esteemed jurist Roger Traynor applied this presumption in 1956. A jury convicted Robert Vogel of bigamy. Vogel protested he was morally innocent because he had a bona fide and reasonable belief his first wife divorced him. (*Vogel, supra*, 46 Cal.2d at pp. 800–801.) Chief Justice Traynor wrote that, "[a]s in other crimes, there must be a union of act and wrongful intent. *So basic is this requirement that it is an invariable element of every crime unless excluded expressly or by necessary implication.* . . . Certainly its exclusion cannot be implied from the mere omission of any reference to intent in the definition of bigamy . . . ." (*Id.* at pp. 801–802, footnotes omitted, italics added.)

Chief Justice Traynor applied the presumption of mandatory culpability: he interpreted the bigamy statute by presuming legislators did not intend their criminal law would ensnare morally innocent people. He quoted the 1866 *Harris*

decision: "It is laid down in the books on the subject, that it is a universal doctrine that to constitute what the law deems a crime there must concur both an evil act and an evil intent. *Actus non facit reum nisi mens sit rea.*" (*Vogel, supra*, 46 Cal.2d at p. 802.)

"Thus, the prosecution makes a prima facie case upon proof that the second marriage was entered into while the first spouse was still living[,] [citations omitted] and his bona fide and reasonable belief that facts existed that left the defendant free to remarry is a defense to be proved by the defendant." (*Vogel, supra*, 46 Cal.2d at p. 803.)

To interpret the statute in this manner, Chief Justice Traynor wrote, "is consistent with good sense and justice." (*Vogel, supra*, 46 Cal.2d at p. 804.) "The severe penalty imposed for bigamy, the serious loss of reputation conviction entails, the infrequency of the offense, and the fact that it has been regarded for centuries as a crime involving moral turpitude, make it extremely unlikely that the Legislature meant to include the *morally innocent* to make sure the guilty did not escape." (*Ibid.*, fn. omitted, italics added.)

*Vogel's* presumption of mandatory culpability thus protected "*morally innocent*" people from criminal liability by placing their blameless conduct beyond the statute's incriminating reach. (*Vogel, supra*, 46 Cal.2d at p. 804, italics added.)

In the years since *Vogel*, the Supreme Court of the United States applied the presumption of mandatory culpability to an array of federal criminal statutes. Important among these is *Staples v. United States* (1994) 511 U.S. 600 (*Staples*).

*Staples* aptly summarized the presumption of mandatory culpability.

"In short, we conclude that the background rule of the common law favoring mens rea should govern interpretation of [the criminal statute] in this case. Silence does not suggest that [the Legislature] dispensed with mens rea for the element of [the statute] at issue here." (*Staples*, *supra*, 511 U.S. at p. 619.)

The *Staples* presumption is fundamental. (See *United States v. United States Gypsum Co.* (1978) 438 U.S. 422, 436–438; *Liparota v. United States* (1985) 471 U.S. 419, 423–434; *Ratzlaf v. United States* (1994) 510 U.S. 135, 137, 140–149; *Posters 'N' Things, Ltd. v. United States* (1994) 511 U.S. 513, 517–525; *United States v. X-Citement Video* (1994) 513 U.S. 64, 69–79; *Dean v. United States* (2009) 556 U.S. 568, 574–575; *Elonis v. United States* (2015) 575 U.S. 723, 732–740; cf. *Counterman v. Colorado* (2023) 600 U.S. 66, 72–82 & fn. 5 (*Counterman*) [imposing mandatory culpability standard of recklessness on a state statute as a matter of federal constitutional law].)

The California Supreme Court recently cited *Staples* when stating the presumption of mandatory culpability. (*People v. Hall* (2017) 2 Cal.5th 494, 501 (*Hall*).) Courts "construe criminal statutes against the backdrop of the common law presumption that scienter is required and imply the requisite mental state, even where the statute is silent." (*Ibid*. [citing *Staples*].)

The 2017 *Hall* decision follows a long line of earlier decisions from the California Supreme Court. Our high court has applied the presumption of mandatory culpability in many other instances.

- *People v. Simon* (1995) 9 Cal.4th 493, 519–522 (*Simon*) [citing *Morissette* and *Vogel*, court adds heightened mental state element to statute criminalizing certain sales of securities].

- *People v. Coria* (1999) 21 Cal.4th 868, 876–880 (*Coria*) [citing *Vogel*, *Staples*, and *Simon*, court implied a mental state requirement; silence regarding a knowledge element does not mean legislators intended to dispense with it]; *id.* at p. 880 [goal is to avoid criminalizing "otherwise innocent activity"]; *ibid.* ["because chemical synthesis ordinarily is 'traditionally lawful conduct,' we may infer the Legislature did not intend to eliminate a mens rea requirement . . . that the accused know of the character of the substance being manufactured"].
- *In re Jorge M.* (2000) 23 Cal.4th 866, 869–870 (*Jorge M.*) [prosecutors must prove a defendant charged with possessing an unregistered assault weapon knew or reasonably should have known the characteristics of the weapon bringing it within the registration requirements]; *id.* at pp. 872–887 [citing *Vogel*, *Staples*, *Simon*, and *Coria*, court states that it is not dispositive that the statute contains no mens rea language; court implies such language to protect morally innocent gun possessors].
- *People v. Rubalcava* (2000) 23 Cal.4th 322, 331–332 & fn. 6 (*Rubalcava*) [literal words of the dirk or dagger statute would criminalize traditionally lawful conduct, so, citing *Staples* and *Coria*, court implied a mental state element: defendants must have the requisite guilty mind, which is that they must knowingly and intentionally carry a concealed instrument capable of ready use as a stabbing weapon].
- *People v. Garcia* (2001) 25 Cal.4th 744, 752–754 (*Garcia*) [citing *Vogel*, *Simon*, *Coria*, and *Jorge M.*, court implied a

11

mental state requirement: proof of a defendant's actual knowledge of the duty to register as a sex offender].

- *People v. Salas* (2006) 37 Cal.4th 967, 971–972 (*Salas*) [legislators could not have meant to impose criminal liability on defendants lacking guilty knowledge of facts that made their the conduct criminal; "Because good faith belief in a security's exempt status is an affirmative defense, the trial court must instruct the jury about it only when the defense has presented evidence sufficient to raise a reasonable doubt that the defendant knew, or was criminally negligent in failing to know, that the security was not exempt" (italics added)]; *id.* at pp. 975–978 [citing *Vogel*, *Staples*, *Simon*, *Garcia*, *Coria*, and *Jorge M.*, court notes "a one-year felony penalty, let alone a $1 million fine, would argue strongly for a guilty knowledge requirement"].
- *People v. King* (2006) 38 Cal.4th 617, 620, 622–628 (*King*) [statute prohibiting possession of short-barreled rifles contained no language about a culpable mental state, but court implied the requirement that prosecutors prove the possessor's knowledge of the weapon's illegal characteristics, citing *Vogel*, *Staples*, *Coria*, *Jorge M.*, and *Rubalcava*].
- *Stark v. Superior Court* (2011) 52 Cal.4th 368, 392–404 [court construes statute to require proof defendants knew, or were criminally negligent in failing to know, their actions and omissions were without lawful authority or were contrary to legal requirements, citing *Vogel*, *Staples*, *Salas*, *Simon*, *Coria*, *Jorge M.*, *Rubalcava*, *Garcia*, and *King*]; *id.* at p. 395 [this holding is a product of "the evolution of our mens rea jurisprudence"].

12

The presumption of mandatory culpability allows us to evaluate Canales's claim that CALCRIM No. 1120 misinterpreted the statute. Our next section presents that statute.

2

The key statute outlaws the continuous sexual abuse of a child. (§ 288.5, subd. (a).) This statute and related authorities state as follows.

"Any person who either resides in the same home with the minor child or has recurring access to the child, who over a period of time, not less than three months in duration, engages in three or more acts of *substantial sexual conduct* with a child under the age of 14 years at the time of the commission of the offense, as defined in subdivision (b) of Section 1203.066, or three or more acts of *lewd or lascivious conduct*, as defined in Section 288, with a child under the age of 14 years at the time of the commission of the offense is guilty of the offense of continuous sexual abuse of a child . . . ." (§ 288.5, subd. (a), italics added.)

" '*Substantial sexual conduct*' means *penetration of the vagina* or rectum of either the victim or the offender by the penis of the other or *by any foreign object*, oral copulation, or masturbation of either the victim or the offender." (§ 1203.066, subd. (b), italics added.)

A finger is *a foreign object*. (*People v. Harrison* (1989) 48 Cal.3d 321, 327–329.)

"Lewd and lascivious conduct" means any touching of an underage child *with the intent sexually to arouse either the defendant or the child*. (*Martinez, supra*, 11 Cal.4th at p. 442.)

The age requirement—that the child victim be under the age of 14 years—is not contested in this appeal.

13

We emphasize two important features of section 288.5, the offense of continuous sexual abuse of a child.

First, the statutory text gives prosecutors three ways of proving continuous sexual abuse: by proof of "substantial sexual conduct"; by proof of "lewd and lascivious conduct"; or by both. This case involved both. We note these alternatives for proving continuous sexual abuse, for later they become significant.

Second, the statutory intent requirements are different for "substantial sexual conduct" and for "lewd and lascivious conduct." The words of the statute contain *no* stated intent requirement for "substantial sexual conduct" (which includes vaginal penetrations). But, by cross-reference to section 288, section 288.5 requires that "lewd and lascivious conduct" (including any touching) be accompanied by a *high* level of intent: "the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child . . . ." (§ 288, subd. (a).) We sometimes refer to this high level of intent as the intent to cause sexual arousal.

The disparity in the statutory intent requirement is the heart of one issue in this appeal. Canales correctly points out that CALCRIM No. 1120 did *not* require the jury to find he penetrated his stepdaughter's vagina *with an intent to cause sexual arousal*.

B

Under the presumption of mandatory culpability, CALCRIM No. 1120 is proper. Canales's first attack fails.

Canales faults the instruction because it permitted the jury to find he engaged in "substantial sexual conduct" with no heightened mental requirement beyond his voluntary decision to perform the physical act. (§ 288.5, subd. (a).) He argues the jury instructions should have demanded a heightened mental state:

14

that he penetrated his stepdaughter's vagina for "the purpose of sexual arousal, gratification, or abuse." By citing *People v. Whitham* (1995) 38 Cal.App.4th 1282, 1293 (*Whitham*), Canales suggests that, without this qualifier, the statute could inculpate morally blameless conduct.

We treat the *Whitham* decision after we apply the presumption of mandatory culpability to test Canales's critique of the jury instruction.

As noted, the continuous sexual abuse statute contains no mental state requirement for acts of "substantial sexual conduct" with a child under the age of 14 years. Neither does CALCRIM No. 1120, which lists the elements of the continuous sexual abuse offense. Yet CALCRIM No. 252 includes some requirements. As given in this case, it instructed as follows. The italics are ours.

"Union of Act and Intent:

General and Specific Intent Together.

"The crime and other allegation charged in Counts 1-4 require proof of the union, or joint operation, of act and wrongful intent.

"The following crime and allegation require general criminal intent: *continuous sexual abuse*, as charged in Count 2 and 4 and the multiple victims allegation. For you to find a person guilty of these crimes or to find the allegation true, that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she *intentionally does a prohibited act*; however, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime or allegation.

"The following crime requires a specific intent or mental state: lewd act upon a child, as charged in Count 1 and 3. For you

15

to find a person guilty of this crime, that person must not only intentionally commit the prohibited act, but must do so with a specific intent. The act and the specific intent required are explained in the instruction for that crime."

The mental state requirement for Counts 2 and 4—that Canales *intentionally did a prohibited act*—mirrors an intent Chief Justice Traynor described in *People v. Hood* (1969) 1 Cal.3d 444, 456–457, italics added: "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant *intended to do the proscribed act*."

An intention to do a proscribed act is a minimal level of intent. It requires only that defendants moved their bodies as a matter of *voluntary* choice, because actions that are not the product of voluntary choice are not criminal. (See *People v. Newton* (1970) 8 Cal.App.3d 359, 376 ["unconsciousness is a complete defense to a charge of criminal homicide"]; *People v. Freeman* (1943) 61 Cal.App.2d 110, 115, 117–118 [epileptic loss of consciousness is a defense, because one is not criminally liable if at the time "he is not conscious thereof"]; Model Pen. Code, § 2.01, subd. (1) [people are not guilty of a criminal offense unless their liability is based on conduct that includes a voluntary act]; Kadish & Schulhofer, Criminal Law and Its Processes (6th ed. 1995) p. 175 ["paradigmatic" involuntary acts are when "a person physically forces the movements of another or in which one's body is in the grip of a spasm or reflex"].)

This mental state—requiring *only* proof that Canales voluntarily inserted his finger or penis into his stepdaughter's vagina, without any further level of mental culpability—satisfies

the presumption of mandatory culpability. Canales does not suggest, nor can we imagine, any morally innocent reason for him to decide to penetrate her as he did.

The jury instruction on this point thus was proper, because this aspect of the statute had no potential to inculpate conduct that was "morally innocent." (*Vogel, supra,* 46 Cal.2d at p. 804.) According to the presumption of mandatory culpability, the Legislature meant only to include morally culpable actions within this law, and—so far as the evidence in Canales's case has shown—all actions within its reach indeed are morally culpable. Culpability is mandatory, and it is present in Canales's case.

Having ascertained that the challenged jury instruction satisfied the presumption of mandatory culpability, we turn to the *Whitham* decision Canales cites.

*Whitham* does not help Canales. *Whitham,* in effect, wrestled with the presumption of mandatory culpability. The *Whitham* court confronted a defendant's argument that the continuous sexual abuse statute could inculpate morally innocent conduct. The defense gave the example of parents who insert a rectal thermometer into their sick child's rectum. A thermometer is a "foreign object" that would "penetrat[e]" the "rectum," thus apparently violating the literal words of the statute. (See § 1203.066, subd. (b), incorporated by reference into § 288.5, subd. (a).) To prevent extending this statute to this morally innocent parental conduct, Whitham urged the court to imply an intent requirement that the penetration had to be to achieve sexual arousal. (*Whitham, supra,* 38 Cal.App.4th at p. 1291.)

This is the same argument Canales makes in this appeal. The *Whitham* court rejected this defense argument, just as we reject Canales's similarly erroneous claim.

17

We explain by delving into the *Whitham* case.

The prosecution accused Sally Ann Whitham of continuous sexual abuse of two girls under 14. This charge invoked the same statute we engage in this appeal: subdivision (a) of section 288.5. The prosecution proved Whitham penetrated the girls' vaginas with her fingers and the handle of a meat tenderizer mallet. (*Whitham*, *supra*, 38 Cal.App.4th at pp. 1288 & 1289, fn. 8.)

Earlier we noted the three alternatives for proving the continuous sexual abuse offense. Now this point becomes significant.

The prosecution deliberately avoided charging Whitham with lewd and lascivious conduct and instead elected to proceed solely on a theory of substantial sexual conduct. (*Whitham*, *supra*, 38 Cal.App.4th at p. 1288.) The prosecution's reason for this tactical election was its fear that Whitham could claim, apparently with some plausibility, that she penetrated the girls not for sexual arousal but rather "for punishment and without any sexual purpose." (*Ibid*.) The prosecution sought to preempt Whitham's possible defense that her intent accompanying her penetrations was to punish the girls and not to create sexual arousal. (*Ibid*.)

The defense thus argued the court should interpret the continuous sexual abuse statute to include a sexual gratification requirement accompanying the substantial sexual conduct element of the offense. (*Whitham*, *supra*, 38 Cal.App.4th at p. 1291.) This is the same argument Canales is making.

Recall the statute has *no* explicit mental state requirement for this portion of the offense. Whitham asked the court to read in a heighted requirement of mental culpability: the sexual gratification intent.

The Court of Appeal rejected Whitham's argument. (*Whitham, supra,* 38 Cal.App.4th at p. 1292.) "We are satisfied the Legislature intended by section 288.5 to target sexual conduct with a child which is undertaken for the purpose of sexual gratification [citation] or which is otherwise *abusive* [citation]. Thus, while the hypothetical parent who takes his or her child's temperature with a rectal thermometer may engage in 'substantial sexual conduct' within the literal terms of section 288.5 since the act involves the child's genitals [citation], such an act without more does not constitute sexual abuse within the scope of the statute." (*Whitham, supra,* 38 Cal.App.4th at p. 1294, italics in original; cf. *People v. White* (1986) 179 Cal.App.3d 193, 205 (*White*) [many acts of penetration of small children would not violate the statute because they are not done to arouse, gratify, or abuse; these acts include inserting a thermometer, suppository, or some other medicine].)

We agree with *Whitham's* result, which is consistent with the logic stemming from Chief Justice Traynor's decision in *Vogel* and the cases following it. The hypothetical parents with the rectal thermometer indeed would trigger concern the statute could criminalize morally innocent conduct and thus would open the possibility the court would imply an exculpatory defense. (See *Vogel, supra,* 46 Cal.2d at pp. 802–803; *Salas, supra,* 37 Cal.4th at pp. 971–972.) But that exculpatory defense would be available only if Whitham's counsel presented evidence the defendant indeed might be morally innocent. (Cf. *Salas,* at p. 972 ["Because good faith belief in a security's exempt status is an affirmative defense, the trial court must instruct the jury about it *only* when the defense has presented evidence sufficient to raise a reasonable doubt that the defendant knew, or was criminally

negligent in failing to know, that the security was not exempt" (italics added)].)

Whitham presented no evidence of "*morally innocent*" conduct. (*Vogel, supra*, 46 Cal.2d at p. 804, italics added.)

It is not morally innocent to punish young girls by inserting foreign objects into their vaginas. Whitham with her fingers and her meat mallet did not share the moral innocence of the hypothetical parents with their thermometer. (Cf. *White, supra*, 179 Cal.App.3d at p. 205 ["when a penetration is accomplished for the purpose of causing pain, injury or discomfort, it becomes sexual abuse, even though the perpetrator may not necessarily achieve any sexual arousal or gratification whatsoever"].)

The same holds for Canales, who presented no evidence of moral innocence. We thus reject his instructional challenge. By citing *Whitham* and referring to parents with a rectal thermometer, Canales suggests that, without this intent qualifier, the statute could inculpate blameless conduct. Like *Whitham*, however, Canales presented no evidence he penetrated his stepdaughter's vagina for a blameless reason.

The presumption of mandatory culpability thus does not require a heightened mental state for Canales's acts of penetration. Courts presume the Legislature did not seek to criminalize morally innocent conduct, but they likewise presume legislators did not impose superfluous culpability requirements so the "guilty" could "escape." (*Vogel, supra*, 46 Cal.2d at p. 804.)

The point is to safeguard the morally innocent, not to make it more difficult for prosecutors to achieve a conviction. (Cf. *Dean v. United States, supra*, 556 U.S. at pp. 575–576 [no need to imply added mental element when other elements ensure defendant is blameworthy].)

When a person penetrates a young girl's vagina with his penis or finger, this act is different in kind than the behavior specified by the element of lewd and lascivious conduct, which involves *any* willful touching of a child. (*Martinez*, *supra*, 11 Cal.4th at p. 442.) Touching children is an everyday and typically innocent event. When done to achieve sexual arousal, however, touching a child does become morally culpable, and criminal as well. (See *ibid*.)

The difference in this conduct—vaginal penetration versus *any* kind of touching—explains and justifies the difference in the intent requirements for "substantial sexual conduct" and "lewd and lascivious conduct." Vaginal penetration of a child is blameworthy if the act is voluntary. Touching a child is blameworthy only if done to create sexual arousal.

This difference means the trial court's use of CALCRIM No. 1120 was proper. Canales's first ground for appeal is without merit.

C

In his second attack, Canales maintains CALCRIM No. 252's instructions on general and specific intent were "incorrect, incomplete and misleading." Canales's argument contains subparts. The first part is an asserted error of *commission*; the second concerns an error of *omission*. That is, Canales first contends the trial court committed reversible error by *instructing* the jury that section 288.5's offense of continuous sexual abuse is a general intent crime. Second, he faults the court for *failing to instruct* the jury that some predicate acts for violations of section 288.5 required specific intent.

The prosecution concedes "CALCRIM No. 252 was incorrect as given." It also maintains the error was harmless under the most rigorous standard of review.

We proceed in three steps. First, we recount Canales's argument. Second, we explain why the error was harmless. Third, we recount Canales's constructive suggestion about avoiding this problem in future cases.

1

We detail the two parts of Canales's attack.

First, Canales contends the court erred by telling the jury the offense of continuous sexual abuse is a "general intent" crime. The court used this term "general intent" when reciting CALCRIM No. 252, which we quoted above and, for convenience, we repeat here as the court gave it, using italics to emphasize key words.

"Union of Act and Intent:

*General and Specific Intent* Together.

"The crime and other allegation charged in Counts 1-4 require proof of the union, or joint operation, of act and wrongful intent.

"The following crime and allegation require *general* criminal intent: *continuous sexual abuse*, as charged in Count 2 and 4 and the multiple victims allegation. For you to find a person guilty of these crimes or to find the allegation true, that person must not only commit the prohibited act, but must do so with wrongful intent. *A person acts with wrongful intent when he or she intentionally does a prohibited act*; however, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime or allegation.

22

The following crime requires a *specific intent* or mental state: lewd act upon a child, as charged in Count 1 and 3. For you to find a person guilty of this crime, that person must not only intentionally commit the prohibited act, but must do so with a *specific intent*. The act and the *specific intent* required are explained in the instruction for that crime."

Canales argues this instruction incorrectly stated the crime of continuous sexual abuse by requiring *only* general criminal intent.

Second, Canales argues CALCRIM No. 252 "was incorrect in failing to inform the jury that some of the predicate acts for the violations of section 288.5 required specific intent."

2

The prosecution concedes "CALCRIM No. 252 was incorrect as given." It argues the error was harmless beyond a reasonable doubt under the *Chapman* standard. (*Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).)

This error indeed was harmless, under *Chapman* or any other standard of review. The proof of Canales's guilt was overwhelming. He touched both girls' vaginas, and elsewhere, in sexually intimate ways that were intended to gratify his own desire. He did so repeatedly, for years on end. The jury accepted the girls' testimony and rejected Canales's conflicting account.

Canales does not suggest a morally innocent or ambiguous explanation of his intent. Only one reason explains why an adult man, in secret, touches a girl's vagina and, afterwards, gives her money and tells her not to tell her mother, and does so repeatedly. This was not a selfless caregiver administering a rectal thermometer or a suppository. Canales's *purpose* was to cause sexual arousal. No other mental state fits the facts.

Canales's trial defense confirms harmlessness. His defense was "it didn't happen." This defense presented the jury with an irreconcilable factual contradiction between the accounts by Canales and the girls. The jury believed the girls and disbelieved Canales.

Issues about mental states were irrelevant. (See *People v. Saavedra* (2018) 24 Cal.App.5th 605, 616 ["The record . . . contains no evidence that could rationally lead to a finding the [charged act] was committed for a purpose other than sexual arousal, gratification, or abuse. Moreover, defendant did not contest the element, but rather denied any culpability. Since no rational jury could have found the specific intent element unproven, the error was harmless beyond a reasonable doubt."].)

3

Canales's learned counsel suggests errors using CALCRIM No. 252 are likely to recur in future cases, but that "it is not entirely clear why CALCRIM No. 252 should exist at all."

Counsel writes, "[t]he distinction between specific and general intent has limited application. As the Supreme Court has explained: 'The distinction between specific and general intent crimes evolved as a judicial response to the problem of the intoxicated offender.' (*People v. Hood* (1969) 1 Cal.3d 444, 455.) Thus: 'To limit the operation of the doctrine and achieve a compromise between the conflicting feelings of sympathy and reprobation for the intoxicated offender, later courts both in England and this country drew a distinction between so-called specific intent and general intent crimes.' (*Id.* at p. 456.) Penal Code section 29.4 subdivision (b) falls within this pattern. It provides, in relevant part: 'Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant

actually formed a required specific intent.' A similar rule applies to cases in which there is evidence that the defendant suffered from a mental disease. Penal Code section 28, subdivision (a) provides, in relevant part: 'Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent.'

"In appellant's case there was no evidence of intoxication or mental disease. CALCRIM No. 252 served no useful function. There was no need to instruct the jury with it.

"In cases in which intoxication and mental disorder are not in issue, it appears it would be better simply to use an instruction on the elements that is not phrased in terms of general intent or specific intent, but instead which simply defines the elements of the offense, including the applicable mens rea. The issue of specific intent or general intent is really superfluous as long as the instruction describing the defense tells the jury exactly what the required mens rea consists of."

Counsel's insightful comments are public-spirited.

We agree that CALCRIM No. 252, if it is retained, could be improved by eliminating the ambiguous and widely criticized terms "specific intent" and "general intent." These terms are not in any statute involved in this case. They are judge-made leftovers from the common law, and they are outdated, troublesome, and generally unnecessary. A better method, tried and true, has been available for many decades.

Modern criticism of the categories of "general intent" and "specific intent" has been detailed and has continued for decades. Esteemed critics have bemoaned the inexactitude of classifying crimes by general and specific intent. The critics include the

25

California Supreme Court and California's Advisory Committee on Criminal Jury Instructions.

Half a century ago, Chief Justice Traynor famously wrote that "[s]pecific and general intent have been notoriously difficult terms to define and apply, and a number of textwriters recommend that they be abandoned altogether." (*People v. Hood* (1969) 1 Cal.3d 444, 456 (*Hood*).) Chief Justice Traynor observed assault, for instance, is appropriately characterized as a specific intent crime, but equally well characterized as a general intent crime. (*Id*. at pp. 457–458.)

The California Supreme Court has repeatedly echoed the Traynor critique of specific and general intent. (E.g., *People v. Hering* (1999) 20 Cal.4th 440, 445 [The terms specific and general intent have been difficult to define and apply and even perhaps have proved to be mischievous. "In any event, courts should avoid rote application."]; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1126–1127 (*Mendoza*) ["The division of crimes into two categories, one requiring 'general intent' and one 'specific intent,' is both simplistic (some crimes have other required mental states such as knowledge) and potentially confusing."].)

"Modern scholars criticize the terminology of general and specific intent on five grounds.

"First, [this terminology] is ambiguous: An offender who acted with 'general intent' may have acted with (a) no excuse, (b) a proven intent to achieve the actual results of her conduct only, (c) a presumed (rather than proven) intent to achieve the actual results of her conduct, or (d) recklessness or negligence. An offender who acted with 'specific intent' may have acted with (a) the culpable mental state required by the definition of an offense, (b) a proven intent to achieve some result beyond that actually

26

achieved, (c) a proven (rather than presumed) intent to achieve the actual results of her conduct, or (d) intent (rather than recklessness or negligence).

"Second, a distinction between general and specific intent is not very useful for an offense with more than two elements. Consider burglary, which might be defined as (1) entering the (2) dwelling (3) of another (4) without permission (5) with the intent to commit a felony therein. Which of these five elements must the offender intend? It does no good to say burglary is a specific intent offense, because that implies that the intent to enter is not enough. There are four other elements. Which of these must the offender specifically intend?

"Third, the terminology of general and specific intent wrongly implies that intent is the only kind of mental culpability possible. A lawmaker might wish to condition burglary on intending to enter a building and commit a felony, while being reckless or negligent as to whether the building is a dwelling and whether the actor has permission to enter.

"Fourth, 'general intent' is often a misleading euphemism: an offense that conditions liability on having reasons to expect a result or know of a circumstance is a crime of negligence, not intent. If the term 'general intent' means culpability for undesired results, it is too imprecise: it does not distinguish between results the actor actually expected and those the actor merely had reason to expect. It also does not distinguish among results that seem certain, probable, or possible.

"Fifth, even though the phrase 'general intent' need not mean 'presumed intent,' it is best avoided because of its historic association with unconstitutional presumptions." (Kaplan,

Weisberg, & Binder, Criminal Law: Cases and Materials (6th ed. 2008) p. 204 (Kaplan).)

Kindred critiques are legion. (E.g., Fletcher, Rethinking Criminal Law, (1978) pp. 453–454 [offering three different definitions of specific intent and four of general intent]; 3 Encyclopedia of Crime & Justice (2002) Mens Rea, pp. 996–997 [distinction between specific and general intent "has been largely abandoned" because it "rested upon no coherent conception, which made it difficult to determine reliably into which category an offense fell"]; LaFave, Criminal Law (4th ed. 2003) p. 252 ["Much of the existing uncertainty as to the precise meaning of the word 'intent' is attributable to the fact that courts have often used such phrases as 'criminal intent,' 'general intent,' [and] 'specific intent' "]; *id*. at p. 253 [" 'General intent' is often distinguished from 'specific intent,' although the distinction being drawn by the use of these two terms often varies"]; Dressler, Understanding Criminal Law (2006) p. 146 ["The terms 'specific intent' and general intent' are the bane of criminal law students and lawyers. This is because the terms are critical to understanding various common law rules of criminal responsibility, yet the concepts are so notoriously difficult to define and apply"] [footnotes, brackets, ellipses, and quotation marks omitted].)

The critics include the Advisory Committee on Criminal Jury Instructions. The Committee writes the CALCRIM instructions "do not use the terms general and specific intent because while these terms are *very familiar* to judges and lawyers, they are novel and often confusing to many jurors. Instead, if the defendant must specifically intend to commit an

act, the particular intent required is expressed without using the term of art 'specific intent.' " (CALCRIM p. xxii, italics added.)

The terms general and specific intent indeed are "*very familiar*" to judges and lawyers, but common usage does not endow the terms with precision. Professor William Roth, for instance, wrote that during his three and a half years as a deputy public defender and four years as a deputy district attorney, "he knew that he did not understand the terms [specific and and general intent] and did not meet anyone who seemed to possess any modicum of true understanding." (Roth, *General vs. Specific Intent: A Time for Terminological Understanding in California* (1979) 7 Pepperdine L.Rev. 67, 70, fn. 18.) Roth adds that use of the terms general intent and specific intent is "a continuing source of confusion in criminal law. The meanings are amorphous and serve little purpose." (*Id.* at p. 67.) Roth echoes the criticism of others: "Because crimes generally consist of several elements (*i.e.*, different things that must be proved), a problem of intent (or blameworthiness) exists as to *each* element." (*Id.* at p. 69.) Roth concludes the continued usage of general and specific intent is "counterproductive." (*Id.* at p. 68.)

The labels general and specific intent ignore the fact that one crime can have different elements, each of which can have a separate mens rea requirement. The general and specific intent labels are too "simplistic." (*Mendoza*, *supra*, 18 Cal.4th at p. 1127.)

This case illustrates that problem. Continuous sexual abuse has different elements, and the different elements have different mental state requirements. This is not unusual. Many offenses have different elements with different mental states.

A single intent label for the entire offense—be it "general intent" or "specific intent"—misses this vital point.

A clearer and more accurate way to instruct juries would be to attach the particular mental state requirement to the particular element of the crime in a single instruction for that crime and, unless required by a relevant statute, to dispense entirely with the superfluous and ambiguous terms of general and specific intent.

The CALCRIM instructions generally take exactly this approach. (E.g., CALCRIM No. 225 ["The People must prove not only that the defendant did the act[s] charged, but also that (he/she) acted with a particular (intent/ [and/or] mental state). The instruction for (the/each) crime [and allegation] explains the (intent/ [and/or] mental state) required."].)

When greater precision about "intent" or "mental state" is needed, the California Supreme Court has pointed the way in the *Cel-Tech* case, which looked to the Model Penal Code's definitions of culpable mental states. (See *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 173 (*Cel-Tech*) [the Model Penal Code has "defined four distinct culpable mental states": purpose, knowledge, recklessness, and negligence]; see Model Pen. Code, §§ 2.01, 2.02.)

The California Supreme Court is not alone. The Supreme Court of the United States also looks to the Model Penal Code's treatment of culpability for precision when interpreting texts that pose, but do not answer, questions about a required mental state. (See *Counterman, supra,* 600 U.S. at pp. 78–82 & fn. 5; *United States v. Bailey* (1980) 444 U.S. 394, 403–406; *United States v. United States Gypsum Co.* (1978) 438 U.S. 422, 444.)

30

The Model Penal Code's approach to the interpretation of criminal statutes is nothing new. The American Law Institute first propounded this material in 1962.

Leading criminal casebooks have taught the culpability approach of the Model Penal Code for decades. (See Kadish and & Schulhofer, Criminal Law and Its Processes (6th ed. 1995) p. 210; Dubber and & Kelman, American Criminal Law: Cases, Statutes, and Comments (2005) pp. v, vii, 176–186; Kaplan, Weisberg, & Binder, Criminal Law: Cases and Materials (6th ed. 2008) pp. xxv, 207–208; Dressler & Garvey, Cases and Materials on Criminal Law (6th ed. 2012) pp. 5, 937–1004; LaFave, Modern Criminal Law: Cases, Comments and Questions (4th ed. 2006) pp. 112, 121, fn. d, Appen. 1–87; Robinson, Criminal Law: Case Studies and Controversies (2005) pp. 24–25, 148, 973-1005; Saltzburg, Diamond, Kinports & Morawetz, Criminal Law: Cases and Materials (2000) pp. 192, 194–205, 873–974; Lee and & Harris, Criminal Law: Cases and Materials (2005) pp. 207–208, 242, 247, 1168–1229; Gardner & Singer, Crimes and Punishment: Cases, Materials, and Readings in Criminal Law (4th ed. 2004) pp. 383, 420–426, App. 1-99; Shatz, California Criminal Law: Cases and Problems (2003) pp. 121, 126-127.)

In appendix A, *post*, p. 38, we quote editions of standard casebooks from yesteryear to illustrate that law students have been learning the Model Penal Code's method of defining elements for a long time.

The terms "general intent" and "specific intent" bring undesirable ambiguity into a field where precision is vital. Judges invented these terms in centuries past. (See *Hood, supra*, 1 Cal.3d at pp. 455–456 & fn. 5.) Circa 1962, the Model Penal Code finished its painstaking effort to create a superior

alternative. Courts and the scholarly community have embraced this alternative as an improvement over the categories of general and specific intent.

Everyone would benefit if we confined use of "general intent" and "specific intent" to cases involving a statute expressly using those terms. Even there, the contributions of the Model Penal Code can refine and clarify the meaning of these historical but ambiguous terms.

## D

Canales forfeited his challenge to the trial court's unanimity instruction.

The trial court gave a *unanimity* instruction because our law requires state criminal juries to vote *unanimously* to achieve a valid criminal conviction. When the evidence suggests more than one crime based on the same conduct, either the prosecution must elect among the crimes or the court must instruct the jury to agree on the same criminal act. The requirement of unanimity aims to forestall convictions where there is no single offense all jurors agree the defendant committed. The instruction helps prevent jurors from combining evidence of multiple offenses, none of which has been proved beyond a reasonable doubt, and then concluding beyond a reasonable doubt the defendant must have done something sufficient to convict on one count. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.)

Canales bases his unanimity objection on the fact the information accused him of two separate—and separately criminal—lewd acts upon his niece. The charged events were years apart; the information keyed their timing to the niece's birth date of December 23, 2001. Count one charged Canales lewdly touched his niece when she was seven, which was the

32

interval between December 2008 and December 2009. Count three charged a different lewd act when she was 12 or 13, which was between December 2013 and December 2015.

Canales argues the court's use of the standard CALCRIM unanimity instruction permitted jurors to convict him of both crimes on the basis of just one act. His precise objection is that the court should have edited the standard CALCRIM No. 3500 unanimity instruction to read as follows, with ~~strikeout~~ text showing the words Canales would eliminate and *italics* showing the words he would add.

"3500. Unanimity

"The defendant is charged with Lewd Act Upon a Child in Count 1 and 3 sometime during the period of December 23, 2008 to December 22, 2009, and December 23, 2013 to December 22, 2015.

"The People have presented evidence of more than one act to prove that the defendant committed ~~this offense~~ *these offenses*. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed ~~at least one of these acts~~ *"at least one of these acts for count 1 and at least one different act for count 3* and you all agree on which act he committed."

Canales forfeited this argument by failing to ask for these changes in the trial court. The court gave Canales a generous opportunity to comment on all proposed jury instructions. After finishing with witnesses, the court excused the jury and held an instruction conference with counsel that covered nine transcript pages. These pages reveal the parties working with the court in a collegial manner. Together, the group went over all the candidate instructions. Canales spoke up about instructions he wanted in or

out, or changed. The court proposed giving an instruction about motive, for instance, but Canales asked the court to exclude it. The court replied, "Okay. We'll take it out."

During this conference, the court specifically directed the parties to consider the instruction on juror unanimity. On this instruction, Canales decided to say nothing.

In this cooperative environment, Canales had an unhurried opportunity to offer views at a time the parties and the court could have discussed and resolved every item of controversy. The clarifying edits Canales now suggests would have been acceptable to the prosecution and the court, in all likelihood, for they were consistent with the case the prosecution presented in closing argument. Canales's silence on the unanimity instruction at the crucial time forfeited his tardy appellate argument. (See *People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1060–1061.)

Canales unsuccessfully attempts to escape forfeiture by claiming the standard CALCRIM unanimity instruction was *legally erroneous* in this situation. He frankly concedes he "has been unable to find a case that addresses the precise issue he raises here."

Canales urges an implausible interpretation of this instruction that is contrary to the way the parties argued the case to the jury. Canales's proposed interpretation is implausible because the instruction's text, as given, referred to two different counts keyed to two different time periods. It would be illogical to conclude a single event could jump back and forth in time to satisfy the requirements of two counts that were explicitly temporally separate, or that jurors were confused on this score. In context, the instruction is reasonably interpreted as telling the jurors they had to agree on one act in the first time frame to

convict on count 1, and they also had to agree on one act in the second time frame to convict on count 3.

Canales's interpretation likewise is contrary to how the prosecution presented the case to jurors. In closing argument and without objection, the prosecution explained the different time intervals the two counts covered and told jurors they had to agree *unanimously* on at least one act by Canales to satisfy count one and a different one to satisfy count three. Nothing in Canales's own closing argument departed from the prosecution's explanation. The thrust of Canales's closing was consistent on this point. Canales's position was total denial, not some distinction between different acts and different time periods.

Canales forfeited this argument.

Canales petitioned for rehearing, which we granted, and purported to withdraw his unanimity argument after having read our initial opinion. We retain the analysis prompting this abandonment. Authors of jury instructions may wish to know of this controversy.

E

Canales must be resentenced because an ex post facto violation invalidated the sentence the trial court imposed. The prosecution concedes this point, and we agree.

The One Strike law is an alternative sentencing scheme applying to certain felony sex offenses. It mandates an indeterminate sentence of 15 or 25 years to life in prison when the jury has convicted the defendant of a specified felony sex crime (§ 667.61, subd. (c) [listing applicable crimes]), and has also found certain factual allegations to be true (§ 667.61, subds. (d), (e)). (*People v. Anderson* (2009) 47 Cal.4th 92, 102.)

35

The One Strike law boosted the sentence for Canales's offenses because the jury found true the multiple-victim allegation. (See § 667.61, subds. (b), (c).) Thus, under the One Strike law, the trial court sentenced Canales to four consecutive terms of 15 years to life, for a total sentence of 60 years to life.

But the One Strike law does not apply, because a timing problem infected the application of the multiple-victim allegation.

The niece and the stepdaughter were both *crime* victims, but the timing issue means only the niece qualified as a *One Strike* victim. Recall Counts 1, 2, and 3 concerned the niece, while Count 4 charged Canales with continuous sexual abuse of his stepdaughter between 2002 and *2005*. This crime, however, was not a One Strike offense until *2006*, when the Legislature amended the statute. (See Sen. Bill No. 1128 (2005–2006 Reg. Sess.) § 33; *People v. Valenti* (2016) 243 Cal.App.4th 1140, 1173–1174 (*Valenti*).)

Canales abused his stepdaughter before the statute recognized his offense as a One Strike crime. This leaves only the niece as a One Strike victim. The multiple-victim enhancement cannot apply when only one victim fits the statutory scheme.

To put the same analysis in different words, the One Strike statute would not have aggravated Canales's sentence when he subjected his stepdaughter to continuous sexual abuse between 2002 and 2005. At that time, the offense of continuous sexual abuse was not a One Strike crime. (*Valenti, supra*, 243 Cal.App.4th at p. 1174.) Not until 2006 did the Legislature amend the One Strike statute to add this offense to the list. (*Ibid.*) Because the stepdaughter was not a One Strike victim at the time of Canales's offense, the niece was the *only* qualifying victim. The multiple-victim allegation applies only when the

defendant offended "against *more* than one victim."  (§ 667.61, subd. (e)(4), italics added.)

Federal and state ex post facto principles prohibit legislatures from retroactively increasing the punishment for a crime. (E.g., *Collins v. Youngblood* (1990) 497 U.S. 37, 42–43; *People v. Grant* (1999) 20 Cal.4th 150, 158.) Yet that is what happened here: the trial court applied the 2006 amendment to increase punishment for a crime that ended in 2005.

The multiple-victim allegation increased sentencing on all four counts. All four counts require resentencing.

We vacate Canales's sentence and remand the case for resentencing without applying the One Strike law. (See *People v. Hiscox* (2006) 136 Cal.App.4th 253, 257–262; *People v. Alvarez* (2002) 100 Cal.App.4th 1170, 1178.)

## DISPOSITION

We affirm Canales's convictions, vacate his sentence, and remand for resentencing without applying the One Strike law.

WILEY, J.

We concur:

STRATTON, P. J.

VIRAMONTES, J.

37

**APPENDIX A**

- Kadish & Schulhofer, Criminal Law and Its Processes (6th ed. 1995) page 210 ("The following text and commentary of the Model Penal Code on culpability requirements (mental elements) is of great importance and should be studied with care. The significance of the commentary will be increasingly apparent as the student progresses through the materials. It should be reviewed as the need arises"), *id.* at pages 1127–1195 (casebook appen. reprints most of Pts. I and II of the Model Pen. Code).

- Dubber & Kelman, American Criminal Law: Cases, Statutes, and Comments (2005) page v ("Paulsen/Kadish (and later Kadish/Schulhofer) was the first casebook based on the Model Penal Code and has set the standard for American criminal law teaching ever since"), page vii ("The Model Penal Code concerned itself mostly with the general part of criminal law, and today pretty much everyone teaches—and thinks about—the general principles of American criminal law along the lines of the Code. If one takes the MPC as the baseline of American criminal law, as we do in this casebook, the study of the general part should be fairly straightforward, while noting 'common law' and 'traditional' variations along the way"), pages 176–186 (introducing Model Penal Code), pages A-1 – A-90 (casebook appen. reprints the Model Pen. Code).

- Kaplan, Weisberg, & Binder, Criminal Law: Cases and Materials (6th ed. 2008) page xxv (this book "enables students to become familiar with the influential Model Penal Code"), page 207 ("The modern trend in American jurisdictions is to use the categories of culpability adopted

and refined by the Model Penal Code"), pages 207–208 (illustrating Model Penal Code's four mental states using a hypothetical about a child breaking a vase), pages 1035–1089 (casebook appen. reprints most of Pts. I and II of the Model Pen. Code), pages 1099–1100 (table listing Model Pen. Code citations).

- Dressler & Garvey, Cases and Materials on Criminal Law (6th ed. 2012) page 5 ("In order to bring coherence to the criminal law, the American Law Institute, an organization composed of eminent judges, lawyers, and law professors, set out in 1952 to develop a model code. A decade later, the Institute adopted and published the Model Penal Code and Commentaries thereto. Key portions of the Code … are set out in the appendix to this casebook. [¶] The Model Penal Code has greatly influenced criminal law reform."), pages 937–1004 (casebook appen. reprints most of Pts. I and II of the Model Pen. Code).

- LaFave, Modern Criminal Law: Cases, Comments and Questions (4th ed. 2006) pages 112, 121 ("Although this distinction between 'general' and 'specific' intent has not been without importance in the criminal law, greater clarity may be accomplished by abandoning this terminology, and this has been done in the Model Penal Code and many of the modern recodifications"), page 121 footnote d ("Model Penal Code § 2.02, (Tent.Draft No. 4, 1955): '[W]e can see no virtue in preserving the concept of "general intent," which has been an abiding source of ambiguity and of confusion in the penal law' "), pages Appendix 1–87 (casebook appen. reprints Pts. I and II of the Model Pen. Code).

- Robinson, Criminal Law: Case Studies and Controversies (2005) pages 24–25 (introducing and explaining Model Penal Code), page 148 ("[T]he Model Penal Code introduced the requirement of culpability as to each element of an offense. ... [¶] This element analysis approach provides, for the first time, a comprehensive statement of the culpability required for an offense. The earlier conceptions of mens rea were not simply undemanding, they were hopelessly vague and incomplete"), pages 965–1064 (casebook appen. reprints Pts. I and II of the Model Pen. Code).
- Saltzburg, Diamond, Kinports, & Morawetz, Criminal Law: Cases and Materials (2000) page 192 ("the Model Penal Code's culpability provision was a response to the analytically confused distinctions evolving from common-law notions of mens rea, including the distinction between general and specific intent"), pages 193–206 (explaining and drilling application of the Model Penal Code), pages 873–974 (casebook appen. reprints Pts. I and II of the Model Pen. Code).
- Lee & Harris, Criminal Law: Case and Materials (2005) pages 207–208 (introducing the culpability provisions of the Model Penal Code), page 242 (the common law distinction between specific intent and general intent "is better understood as the product of history than of logic"), page 247 ("The Model Penal Code does not employ the specific intent/general intent distinction"), pages 1168–1229 (casebook appen. reprints most of Pts. I and II of the Model Pen. Code).
- Gardner & Singer, Crimes and Punishment: Cases, Materials, and Readings In Criminal Law (4th ed. 2004)

page 383 ("A second common law problem with intent has been self-inflicted by the criminal law courts—the alleged distinction between a *specific* and a *general intent*"), pages 420–426 ("THE IMPACT OF THE MODEL PENAL CODE"), App. 1–99 (casebook appen. reprints Pts. I and II of the Model Pen. Code).